# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-DP-00975-SCT

*HOWARD GOODIN a/k/a HOWARD D. GOODEN a/k/a HOWARD DEAN GOODIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/1999 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EDMUND J. PHILLIPS, JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JUDY T. MARTIN |
| DISTRICT ATTORNEY: | KEN TURNER |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/17/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Howard Goodin was indicted in the Circuit Court of Newton County for armed robbery and capital murder. Following a change of venue to the Circuit Court of Lamar County, Goodin was convicted of armed robbery and capital murder in the Circuit Court of Lamar County in May of 1999. The trial court conducted a habitual offender sentencing hearing at which time Goodin was sentenced to life imprisonment without parole on the armed robbery count. Upon hearing additional testimony in aggravation and mitigation of sentence, additional arguments, and further instructions, the jury returned a sentence of death by lethal injection for the capital murder. Aggrieved, Goodin appeals to this Court.

## FACTS

¶2. The events which occurred inside Willis Rigdon's Store and Restaurant in the early morning hours of November 5, 1998, were recorded by surveillance cameras. The surveillance tapes show a black man, identified as Howard Goodin, entering Rigdon's Store in Union, Mississippi, around 1:44 a.m. Goodin browsed around the video rental section for a few minutes before pulling a gun on the owner of the store, Willis Rigdon. Goodin then disconnected a surveillance camera and the TV and VCR to which it was attached. The tape shows Goodin and Rigdon exiting the store carrying the surveillance camera, TV, and VCR. The two men reenter the store and exit once again with Goodin waving a gun and Rigdon holding his hands in the air. At 1:57 a.m. a witness drove by Rigdon's Store and saw Rigdon sitting in his truck on the driver's side and a black man hunched over in the passenger side.

¶3. Shortly after 2:00 a.m., Mitchell Graham and his wife, who live about one mile from the Union city limits and about four miles from Rigdon's store, were awakened by someone knocking on their front door and ringing their door bell. Graham went to the door and, without opening the door, asked who was there. There was no response. Thinking it might be a trouble maker, Graham's wife called her father and told him to drive down to their house to scare the person away. When Graham saw his father-in-law's car, he turned on the outside light and opened the door to find Willis Rigdon lying face down in a pool of blood on the front porch. Rigdon was bleeding profusely from two gunshot wounds to the head and neck. Graham's wife called 911 to request an ambulance.

¶4. Graham asked Rigdon what happened, and he stated that he had been shot and robbed. Graham then asked Rigdon if he knew who did it. Rigdon replied, "No, I don't. It was a black man." Rigdon was then transported to the hospital where he subsequently died as a result of the gunshot wounds.

¶5. Between 3:00 and 3:30 a.m., Goodin was seen in Philadelphia, Mississippi, driving Rigdon's truck and carrying a large sum of money. Philadelphia is approximately thirteen miles from the city of Union. At 4:30 a.m., Goodin, still driving Rigdon's truck, went to the home of his nephew, Kelly Junior Peden, who resides in Philadelphia. Peden noticed that the steering column of the truck was broken. Goodin later attempted to start the truck with a screwdriver, but was unable to do so. Peden then became suspicious and told Goodin that he could not leave the truck in his driveway. Goodin then removed the license plate from the truck and threw it away.

¶6. Goodin left Peden's house and walked to the home of his cousin, Iris Owens, and asked her to drive him to Union. She told him that she did not drive at night and instead called a tow truck. The tow truck driver, John Raymond Roberts, picked Goodin up at Owens' home and drove him to Peden's home. Roberts asked Goodin who owned the truck, and Goodin responded, "This white fellow in Union." Roberts noticed that the truck had no license plate and that the steering column was broken. He told Goodin that he would have to call the police department and have the VIN number run before he could tow the truck. Goodin told Roberts to do whatever he wanted with the truck but to take him back to Owens' house. Before the men left the Peden house, Goodin got a TV and VCR out of the back of Rigdon's truck and put it in the tow truck. Goodin then gave Roberts $50.00 from a long sock of money he had in his pocket. Roberts then drove him to Iris Owens' house. As Goodin exited the tow truck, he told Roberts, "You don't know me, and I don't know you." Goodin took the TV and VCR into Owens' house.

¶7. Iris Owens testified that Goodin returned to her house with a VCR and TV. He then left saying he would be back to get the VCR and TV. Goodin never returned. Later that morning, the police came to Owens' house. Owen turned the VCR and TV over to the police. The police asked Owens whether Goodin was armed when he was at her house. She told the police that she had not seen a gun. She later found a gun hidden among her crochet items. She then called the police who returned and retrieved the gun.

¶8. When Goodin's nephew, Peden, heard about the robbery and description of the truck, he called the police and told them that a truck fitting that description was at his house. Tow truck operator Roberts saw the surveillance tapes showing Goodin and Rigdon on a news broadcast. He too notified the police. Based on the information from the video surveillance tapes and the statements of Peden, Roberts and Owens, the police began searching for Goodin. They arrested him later that day at the home of Jetty Mae Kelly in Philadelphia, Mississippi. He had a stocking filled with $590.00 in his pocket at the time of the arrest.

¶9. Goodin was booked, and an officer took him to get a shower and change into jail clothes. At this time

Goodin took $200.00 out of his socks. After his shower, Goodin took another $700.00 out of his mouth.

¶10. Goodin was tried as a habitual offender in the Circuit Court of Lamar County for the capital murder of Willis Rigdon during the commission of a kidnapping in Count I and armed robbery in Count II. Goodin's previous convictions include:

| | |
|---|---|
| 1972 Shoplifting | 2 years |
| 1973 Burglary | 5 years |
| 1977 Second Degree Sexual Assault | 7 years, each count, concurrent |
| Robbery | |
| Burglary | |
| 1980 Armed Robbery | 25 years |
| 1982 Aggravated Assault | 25 years |
| Armed Robbery | |
| Attempted Armed Robbery | |
| Assault on a Law Enforcement Officer | |
| 1995 Burglary | 6 years |

Goodin had been out of prison only five months before the murder. The jury convicted Goodin on both counts and sentenced him to death by lethal injection.

## DISCUSSION

### I. WHETHER THE COURT ERRED IN GIVING SENTENCING INSTRUCTION S-2.

¶11. Goodin argues that the trial judge committed reversible error by giving sentencing instruction S-2 regarding aggravating and mitigating circumstances. "In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So.2d 777, 782 (Miss.1997) (quoting *Collins v. State*, 691 So.2d 918 (Miss.1997)). Sentencing instruction S-2 reads as follows:

> The Court instructs the Jury that it must be emphasized that the procedure that you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment without parole, life imprisonment or whether it requires the imposition of death, in light of the totality of the circumstances present.

¶12. Goodin contends that this instruction violates the Eight Amendment of the U.S. Constitution by permitting the jury to substitute its own judgment in place of the statutory scheme. See, Miss. Code Ann. § 99-19-101. Goodin further argues that the instruction invites the jurors to ignore the elements of aggravation and mitigation or to set them aside in favor of their own subjective feelings about the proper

sentence.

¶13. The State argues that this instruction does not violate either the statute or federal cases regarding the imposition of the sentence of death. To the contrary, the State submits that the instruction enhances the weighing process required by statute.

¶14. This Court has approved the use of nearly identical instructions in *Edwards v. State*, 737 So.2d 275 (Miss. 1999), and *Watts v. State*, 733 So.2d 214 (Miss. 1999). We explained that Miss. Code. Ann. § 99-19-101 clearly limited "the aggravating factors which a trial jury may consider to those specifically listed in subsection five of the statute." *Edwards*, 737 So.2d at 314 (citing *Balfour v. State*, 598 So.2d 731, 747-48 (Miss. 1992)). This Court held that this instruction "did not instruct the jury to consider other non-statutory aggravating factors. It merely informed the jury on the manner in which they were to evaluate those aggravating circumstances which they could consider under the statute." *Id.* (quoting *Lester v. State*, 692 So.2d 755, 801 (Miss. 1997)).

¶15. Disputes about jury instructions in the trial courts should be based on more than a quest for technical purity. The question for the trial courts should be: do the instructions fairly state the laws of Mississippi? A fair reading of our precedents and the instructions in this case dictate the obvious appropriateness of the instruction given. We find the trial court did not err in granting sentencing instruction S-2 for the jury to consider in determining the sentence to impose.

¶16. For the first time on appeal, Goodin also asserts that sentencing instruction S-2 read together with S-3 negated the required specificity provided for by Miss. Code Ann. § 99-19-101. Sentencing Instruction S-3 read as follows:

> The Court instructs the Jury that at this hearing, the State may elect to stand on the case made at the guilt hearing and you may consider the evidence presented during the guilt phase of this trial together with the evidence presented at the sentencing phase in deciding whether the Defendant shall be sentenced to death, life imprisonment without parole, or life imprisonment.

Goodin contends that these instructions read togther permit any matter brought up during the guilt or sentence phase to be considered by the jury in sentencing, whether or not they relate to aggravating and mitigating circumstances.

¶17. In regard to the presentation of evidence at the sentencing phase, this Court has held:

> At the sentencing hearing, the question to be decided by the jury is whether the defendant shall be sentenced to death or to life imprisonment. At this hearing, the State may elect to stand on the case made at the first hearing, if before the same jury, or may reintroduce any part of the evidence adduced at the first hearing which it considers to be relevant to the particular question of whether the defendant shall suffer death or be sentenced to life imprisonment.
>
> *Jackson v. State*, 337 So.2d at 1256. See also *Evans v. State*, 725 So.2d 613, 1997 WL 562044, ¶ 395-97 (Miss.1997); *Holland v. State*, 705 So.2d 307, 350 (Miss.1997); *Williams v. State*, 684 So.2d 1179, 1207 (Miss.1996); *Davis v. State*, 660 So.2d 1228, 1253-54 (Miss.1995); *Mack v. State*, 650 So.2d 1289, 1323-24 (Miss.1994); *Foster v. State*, 639 So.2d 1263, 1301 (Miss.1994); I*n re Jordan*, 390 So.2d 584, 585 (Miss.1980). Further, this Court has held that it is "preferable" for the State to move for the reintroduction of the evidence produced at the

guilt phase at the beginning of the sentencing phase. *Mack v. State*, 650 So.2d 1289, 1323-24 (Miss.1994).

*Turner v. State*, 732 So.2d 937, 952-53 (Miss. 1999). It is clear from our precedents that any matter brought up during the guilt phase may be considered by the jury in the sentencing phase. For the above reasons, Goodin's claims are without merit.

## II. WHETHER THE PROSECUTOR VIOLATED RULE 3.05 IN INSTRUCTING JURORS AS TO THE LAW DURING VOIR DIRE AND DENIED GOODIN A FAIR TRIAL.

¶18. Goodin argues that during voir dire the prosecutor explained his perspective of the law governing the presentation of the case to the jurors in violation of URCCC 3.05. Rule 3.05 provides that during voir dire, an attorney shall not offer an opinion on the law. Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow. *Acevedo v. State*, 467 So.2d 220, 226 (Miss. 1985). Goodin bases this assignment of error on two statements made by the prosecution. Each statement will be discussed separately.

## STATEMENT NO. 1

¶19. During voir dire, the prosecution made the following comments to the jury:

> Now, I'm going to talk to you a minute about evidence, but one thing I want to point out to you is that I anticipate in this case that there will be a good amount of circumstantial evidence. There's nothing wrong with circumstantial evidence. That just simply means it's not eyewitness testimony and it's not a confession; but circumstantial evidence is good evidence, as far as the law is concerned.

> Now, do you understand, also, that just because this is a capital murder case, there's nothing wrong with there being circumstantial evidence introduced? That's evidence that is held equally highly in the law, just as any other evidence. Anyone have a problem with that? As I mentioned, it just simply means evidence other than a confession or eyewitness testimony.

> If it turns out that the entire evidence is circumstantial evidence, then the law is that the State's burden is proof beyond a reasonable doubt, to the exclusion of every reasonable hypothesis consistent with innocence, which I have never been able to see how that changes a thing, because it's still you have to prove it beyond a reasonable doubt. Anyway, that's the phrase that the law uses.

The prosecution also stated on two occasions during voir dire that it had "the burden of proof, or the responsibility of going forward."

¶20. Goodin interposed no objection at trial to the comments made by the prosecutor, but rather presents this issue for the first time on appeal. "It is incumbent on defense counsel to raise a proper objection when the offensive language is uttered or waive appellate review of the issue." *Foster v. State*, 639 So.2d 1263, 1288-89 (Miss. 1994). Though this error was not raised at trial, we find it worthy of discussion and, therefore, will fully address it below.

¶21. Goodin contends that in stating that there is no essential difference between the burden of proof in a circumstantial evidence case and in a case that depends on direct evidence, the prosecution misstated the

law. Goodin also argues that the prosecution's statement about its responsibility of going forward misled the jury and denied him a fundamental right. In support of this argument, Goodin cites *Westbrook v. State*, 202 Miss. 426, 432-33, 32 So.2d 251, 252 (Miss. 1947), in which this Court stated, "[i]t is fundamental that convictions of crime cannot be sustained by proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to that height which will exclude every reasonable doubt. . . ."

¶22. The State submits that the comments made by the prosecutor during voir dire did not rise to the level of reversible error. The State further argues that the prosecutor was attempting to find out if any of the prospective jurors had a problem with returning a guilty verdict or a death sentence based on circumstantial evidence.

¶23. This Court has held a juror can be questioned during voir dire and challenged for cause if his views concerning the death penalty will prevent or substantially impair him in determining guilt or innocence in accord with his oath. *Jones v. State*, 381 So.2d 983, 992 (Miss. 1980). We have extended this holding to include the inability of the prospective juror to return a death sentence when the case is purely circumstantial. *Taylor v. State*, 672 So.2d 1246, 1264 (Miss. 1995). Therefore, in this respect, the inquiry into whether the potential jurors had any reservations regarding circumstantial evidence was proper.

¶24. The State points out that prior to this statement by the prosecution, the trial judge had instructed the prospective jurors that the burden of proof in a criminal case was beyond a reasonable doubt. Counsel for Goodin also stated during voir dire that the State had the burden of proving each count beyond a reasonable doubt. The State argues that the prosecutor knew what the evidence in this case would show and was merely explaining to the jury that the State would bear the additional burden required in a circumstantial evidence case. The State asserts that the prosecution was actually stating the proper burden of proof required in such cases, and that the trial judge and counsel for Goodin were stating an incorrect burden.

¶25. In the alternative, the State argues that any comments made by the prosecution during voir dire were harmless error since the jury was properly instructed on the burden of proof at the conclusion of the case. The Court instructed the jury as follows:

BY THE COURT: Ladies and gentlemen, I will read to you the instructions. You will have these instructions when you retire to the jury room to consider the evidence of the case. Do not single out one instruction as being the only one you should apply to the case, but apply all of the instructions to the evidence as you recall that evidence.

The Court will presently instruct you as to the rules of law which you will use to apply to the evidence in reaching your verdict.

When you took your place in the jury box, you made an oath that you would follow and apply these rules of law to the evidence in reaching your verdict in this case. It is, therefore, your duty as jurors to follow the law which I shall now state to you.

You are not to be concerned with the wisdom of any rule of law. Regardless of any opinion you may have of what the law ought to be, it will be a violation of your sworn duty to reach a verdict upon any other view of the law than that given in these instructions by the Court.

You are not to single out one instruction alone as stating the law, but you must consider these instructions as a whole.

¶26. The trial court granted Goodin's requested jury instructions D-13 and D-15. Instruction D-13 reads:

The Court instructs the Jury that if the State has resorted, in any way or in the least, to circumstantial evidence to maintain its theory of guilt of the Defendant, then the evidence for the State and every part and parcel of it must be so strong as to establish the guilt of the Defendant not only beyond every reasonable doubt, but the evidence must be so strong as to exclude every other reasonable hypothesis, or supposition, except that of guilt.

Instruction D-15 reads:

The Court instructs the jury that if there be any facts or circumstances in this case acceptable to two reasonable interpretations, one favorable and the other unfavorable to the Defendant, and when the jurors have considered such facts and circumstances with all the other evidence, there is a reasonable doubt as to the correct interpretation, the jury must resolve such doubt in favor of the Defendant and place upon such facts or circumstances the interpretation favorable to the Defendant.

¶27. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court explained that all federal constitutional errors in the course of a criminal trial do not require reversal. "The *Chapman* standard recognizes that 'certain constitutional errors, no less than other errors, may have been harmless in terms of their effect on the factfinding process at trial'" *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The reviewing court must consider "not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Id.* at 278, 113 S.Ct. at 2081. Harmless-error review looks to the basis on which "the jury actually rested its verdict." *Id.* at 279, 113 S.Ct. at 2082. "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*

¶28. Clearly it was error for the prosecutor to instruct the prospective jury as to the law during voir dire. However, the error was harmless as the verdict rendered in this trial was unattributable to the misstatements. The jurors were later properly instructed both in written and oral form as to the burden of proof by the trial judge, and they were instructed to apply these rules to the evidence in reaching a verdict. We find that the guilty verdict rendered in the case sub judice was not attributable to this error assigned by Goodin. Therefore, the error was harmless.

## STATEMENT NO. 2

¶29. Next Goodin argues that during voir dire the prosecutor tied the presumption of innocence to the burden of proof in the following statement:

Now the judge has told you at this time, as in any criminal case, the Defendant is clothed with the presumption of innocence. In other words, the State has not gone forward yet by producing witnesses to testify to meet its burden of proof, so at this point, the Defendant is clothed with the presumption of innocence.

But, do you understand that once the State of Mississippi does go forward and puts on evidence, and after you have considered all the evidence, if you feel the burden of proof has been met, then at that point, the presumption of innocence is erased, and he no longer enjoys that protection? Does everyone understand that?

Goodin argues that this statement invited the jury to do away with the presumption of innocence after the offer of any proof by the State. He asserts that the prosecution misstated the law because guilt must be proven beyond a reasonable doubt to do away with the presumption.

¶30. The State contends that this statement by the prosecutor was only a paraphrase of instruction D-5 granted the defendant at the conclusion of the case, which reads in pertinent part:

At the outset of a trial the Defendant is presumed to be wholly innocent of the whole crime charged, he is not required to prove himself innocent or put on any evidence at all. In considering testimony in the case you must look at the testimony and view it in the light of that presumption which the law clothes the Defendant with, that he is wholly innocent, and it is a presumption that abides with him throughout the trial of the case until the evidence convinces you to the contrary beyond all reasonable doubt of his guilt, and to the exclusion of every reasonable hypothesis consistent with his innocence.

The State argues that its statement was a correct statement of the law and included the statement that the presumption stayed with the defendant until the jury had heard all of the evidence and was convinced that the State had met its burden. We find this argument to be persuasive.

¶31. Although it was error for the prosecutor to instruct the jurors as to the law during voir dire, such error was harmless since it was not a misstatement of the law. The jurors were later properly instructed again as to the presumption of innocence and the burden of proof by the trial judge. The guilty verdict rendered in this case was not attributable to this error, and therefore, the error was harmless.

### III. WHETHER GOODIN RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL.

¶32. At trial, Will Rigdon, grandson of the victim, identified two videotapes of the occurrence in the victim's store and identified Goodin as the person on the tapes who was robbing his grandfather. Will Rigdon testified as follows:

Q. Right here. What camera is showing this particular picture?

A. It's the one, I have labeled two here.

Q. All right. This would be this individual here coming in through this second set of doors here?

A. Yes, sir.

Q. All right. You have had an opportunity to view this film; is that correct?

A. Yes, sir.

Q. Can you identify the person shown there?

A. Mr. Goodin.

Will Rigdon further testified from the video that it appeared to him that Goodin had a gun in his right hand. He explained this interpretation of the video as follows:

Q. And, in fact, when we watched the tape, when he came around the corner and all the way through the tape, he's holding his hands up; is he not?

A. Yes, sir. It looks like he is.

Q. But, he is not holding them up above his head or shoulders, he is just holding them around his chest area; is that correct?

A. Yes, sir. It appears to be so.

Q. Now, the item that's there in the other man's hand is a dark item; is it not?

A. Yes, sir, a dark item that appears to be a gun.

Q. Appears to be a gun?

A. Yes, sir.

Q. But, that gun, it if is a gun, the dark item, is not raised there until about half way down the aisle; is that correct?

A. Yes. sir. It's held by his side.

Q Held by his side?

A. Yes, sir.

Q. And does that show up in this series of still photographs which is marked States Exhibit 17?

A. Does the object allegedly a gun, show up, or does his raising it up show up? Which part were you asking showed up?

Q. You said he was holding it by his side, the dark object, up until, you know, about halfway down the aisle?

A. Yes. sir.

Q. Does it show up in that?

A. Yes, sir. If you watch it on the tape, you can see it clearly. It's a bit smaller here. With magnification, I think it could be easily noticed.

Q. Okay. This exhibit 17 has five rows of pictures; does it not?

A. Yes, sir, it does.

Q. Going across, and there's six pictures per row?

A. Right.

Q. Now, on the second row here is where the pictures are when they are walking down the aisle; is that correct?

A. Yes, sir, with one starting on -- with the sixth one on the first and continuing through the second on the third.

Q. Okay. Now, the particular photograph, enlargement, that you hold in your hand, which is Exhibit 15, shows up about the --

A. Fourth one on the second row?

Q. Fourth one?

A. Yes, sir.

Q. But, on the first, second and third one, the Defendant's hands are both down, are they not, the Defendant's hands?

A. The Defendant's hands, yes, sir, are down?

Q. Now, do you see any object in the Defendant's right hand in those pictures?

A. Yes, sir, I do. Right here and right there, the dark object (indicating).

Q. The dark object?

A. Yes.

Q. And, you take from that to be a firearm, a gun?

A. I would assume it would have to be a firearm for my grandfather to be walking with his hands raised up here.

¶33. Goodin asserts that he did not receive effective assistance of counsel in violation of the Sixth Amendment because his attorney did not object to Rigdon's identification. Goodin argues that the trial court would have sustained the objection pursuant to M.R.E. 602 which provides in pertinent part,"a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." Goodin argues that Will Rigdon was not in the store that night and therefore had no personal knowledge of the situation.

¶34. Goodin contends further that the State failed to produce any other testimony that identified him as the person in Rigdon's store that night. The record belies this assertion. John Raymond Roberts, the tow truck driver, testified that he identified Goodin from a television news broadcast which ran the surveillance tapes. He testified that after seeing the surveillance tapes on the news, he called the Sheriff. On direct examination he testified as follows:

Q. All right; and, now, where did you go after you let Howard Goodin out?

A. I went back to the house.

Q. What did you do when you got back to the house?

A. I called my cousin in Kemper County, and he said they had some trouble last night, and I said, "What kind of trouble?" And he says, "Somebody shot somebody in Union."

Q. Did you turn on the television?

A. So, I turned the TV on.

Q. What did you see when you turned on the television?

A. I saw Mr. Goodin coming down the aisle with the gun.

Q. You say Mr. Goodin coming down the aisle with the gun?

A. Looked like the aisle or something.

Q. On the news --

A. Yes, sir.

Q. -- broadcast?

A. Yes, sir, and I called Neshoba 1.

Q. Called who?

A. Glen, Mr. Glen Waddell.

Q. Mr. Glen Waddell?

A. Yes, sir.

Q. Is that the Sheriff of Neshoba County?

A. Yes, sir.

Finally, on direct examination, Goodin himself testified that he was in Rigdon's Store that night and identified Rigdon and himself as the persons in the video surveillance tapes.

¶35. The well-established test for determining whether a defendant received effective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There the Supreme Court held, "[t]he benchmark for judging claims of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. In *Strickland*, the Court explained:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel

was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064. *Accord*, **Stringer v. State**, 454 So.2d 468, 476-77 (Miss. 1984) The Court, through Justice O'Connor, further stated:

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. *See United States v. Decoster*, 624 F.2d at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134 [102 S.Ct. 1558, 1573-1575, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. New York*, *Supra*, [350 U.S. 91] at 101 [76 S.Ct. 158 at 164, 100 L.Ed. 83]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . .

466 U.S. at 688-89, 104 S.Ct. at 2065.

¶36. The standard set forth in **Strickland** was adopted by this Court in **Stringer v. State**, 454 So.2d at 476-78, and has since been consistently followed. Employing this standard we will examine this claim of ineffectiveness made by Goodin.

¶37. First, Goodin must show that the defense counsel's performance was deficient. Perhaps Goodin's defense counsel should have objected to the identification by Will Rigdon pursuant to M.R.E. 602. However, this does not automatically mean that the error made was so serious as to deny Goodin the "counsel" guaranteed him under the Sixth Amendment. Goodin must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Goodin has failed to

show any evidence that would overcome this presumption. However, even if Goodin had indeed met his burden of proof under the first prong of this test, he has failed to meet the second requirement set out in *Strickland.*

¶38. Goodin must show secondly that the deficient performance prejudiced his defense. The record simply does not support this argument. Even if defense counsel had objected to the identification by Will Rigdon and had the trial court sustained the objection, the tow truck driver later testified that he identified Goodin from the surveillance tapes shown during a news broadcast. This identification prompted him to call the police. Finally, Goodin identified himself on the tapes from Rigdon's Store during direct examination.

¶39. We find that Goodin's argument does not in any way satisfy the requirements of *Strickland*. The conduct of defense counsel did not fall below the level of effective assistance of counsel as guaranteed by the Sixth Amendment. This argument is without merit.

### IV. WHETHER THE COURT ERRED IN PERMITTING THE STATE TO ARGUE IN THE PUNISHMENT PHASE THAT THE VICTIM WAS DENIED THE PROTECTION OF THE LAW BY THE APPELLANT.

¶40. The prosecutor stated as follows in his closing argument during the sentencing phase:

[Y]ou know what's really aggravating about this? Willis Rigdon was just a simple storekeeper, operated a business that in large part his entire family supported, and you can tell from the pictures that you saw in the case, that he was willing to give the Defendant anything that he wanted in that store, cooperated with him every way he could, if he would just leave and just leave him alone.

But, the Defendant didn't do that. He executed Willis Rigdon.

What is even more aggravating about it is Willis Rigdon that night, he didn't have the protection of the law that Howard Goodin has got.

BY MR. BROOKS: I am going to object to that argument, Your Honor. That is not an aggravating factor in this case.

BY THE COURT: Overruled.

BY MR. DUNCAN [Assistant District Attorney]: He didn't have the Constitution out there to protect him that night, didn't have a judge to hear his case.

BY MR. BROOKS: Object to that argument, Your Honor. That doesn't have any bearing on this case.

BY THE COURT: Overruled. A lawyer has the right to argue the facts of a case the inferences flowing from those facts and make conclusions. Now, this Court is very reluctant to restrict any lawyer from making his argument, provided he stays within the rules. Overruled.

BY MR. DUNCAN: Didn't have a lawyer out on that dirt road to plead his case that night, and he didn't ask twelve people like you if it was okay to execute Willis Rigdon.

¶41. Goodin argues that the purpose of the sentencing phase of a capital trial is to balance the aggravating

and mitigating factors. Goodin contends that the above-quoted statements demean the sentencing phase of the bifurcated trial process and thus diminish the protections afforded by a separate sentencing phase in violation of his Eighth Amendment rights. The standard of review for prosecutorial misconduct has been clearly established. "Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must follow." *Acevedo v. State*, 467 So.2d at 226.

¶42. We have previously found similar arguments to be error, though not reversible since the statements were made in isolation. *See Wells v. State*, 698 So.2d 497 (Miss. 1997); *Davis v. State*, 684 So.2d 643, 654 (Miss. 1996); *Shell v. State*, 554 So.2d 887, 900 (Miss. 1989).

¶43. The facts in this case overwhelmingly indicate the defendant's callous indifference to human life. The statutory elements supporting the penalty of death should have been easily met. In such a case, we find it troubling that the prosecutor would exhibit such blatant contempt of the law in order to obtain a death sentence. We have previously cautioned prosecutors against using such statements in closing arguments.

¶44. We must conclude that the district attorney and his assistants in this case have either not comprehended the law or have simply ignored our prior admonishments. When they took their oaths to become attorneys in this state, they swore to "support the Constitution of the State of Mississippi . . . ." Miss. Code Ann. § 73-3-35 (2000). Those who take the oath to become a district attorney, swear to uphold the Constitution of the United States and the Mississippi Constitution. Miss. Const. art. 14, § 268. These oaths are violated when jurors are instructed to ignore constitutional rights. Such blatant disrespect of the prior rulings of this Court, and more importantly, the constitutional rights of the accused will not be tolerated.

¶45. Jury decisions should be based on the rational weighing of facts and law. Unnecessary appeals to passion, bias, and prejudice must be avoided. Challenges to a jury to ignore constitutional rights and rules of law are reprehensible and will no longer be overlooked. We have repeatedly criticized this line of argument and have given fair warning to the bar that such statements are in error.

¶46. We once more must condemn as strongly as possible arguments evidencing disrespect for the rule of law and the constitutional rights of defendants. However, our review of this case indicates that the prosecutors' crude appeals likely did not influence the jury one way or the other. Evidence of the defendant's callous indifference to human life in this case is overwhelming. The jury's sentence in this case was well-supported by the record. Our respect for the rule of law and the findings of juries constrains us to find no reversible error on this issue. In a closer case, such statements might affect the jury's verdict and warrant reversal, but such is not the case here.

### V. WHETHER INSTRUCTING THE JURY THAT IT COULD CONSIDER TWO SEPARATE CRIMES COMMITTED WHILE APPELLANT WAS ENGAGED IN COMMISSION OF THE CAPITAL CRIME AS TWO SEPARATE AGGRAVATING CIRCUMSTANCES WAS ERROR.

¶47. Instruction S-5 was given over defense objection. With regard to aggravating factors, Instruction S-5 provided in pertinent part:

1.) Whether the capital offense was committed while the Defendant was engaged in the commission of kidnapping.

2.) Whether the capital offense was committed while the Defendant was engaged in the commission of robbery.

¶48. Goodin argues that instructing the jury that it could consider two separate crimes committed while he was engaged in the commission of the capital crime as two separate aggravating circumstances was error.

¶49. "The use of the underlying felony . . . as an aggravator during sentencing has been consistently upheld in capital cases." *Walker v. State*, 671 So.2d 581, 612 (Miss. 1995). This Court stated:

> The argument is the familiar "stacking" argument that the state can elevate murder to felony murder and then, using the same circumstances, can elevate the crime to capital murder with two aggravating circumstances. As pointed out in *Lockett v. State*, 517 So.2d 1317, 1337 (Miss. 1987), this Court has consistently rejected this argument. *Minnick v. State*, 551 So.2d at 96-97. The United States Supreme Court has confirmed that this practice does not render a death sentence unconstitutional.

671 So.2d at 612.

¶50. Also, in *Blue v. State*, 674 So.2d 1184, 1218 (Miss. 1996), we approved the use of the conviction of crimes in other counts of the indictment as aggravating circumstances in the sentencing phase. Blue was convicted of murder during the commission of a sexual battery and a separate count of sexual battery. The State was allowed to use both counts of sexual battery as aggravating circumstances. *Id.* In upholding the sentencing instruction, we stated:

> [T]he Count II sexual battery charge is a *separate and distinct act*. In Count I, the sexual battery involved the act of penetrating the victim's anus with a bat. The Count II sexual battery charge involved the act of penetrating the victim's anus with Blue's penis. Second, there is no proof that the sexual battery used as an aggravating circumstance was that found in Count II. Even if the Count II act of sexual battery was used as an aggravating circumstance, as the State asserts, aggravating circumstances carry no penalty. The only purpose aggravating circumstances serve is to narrow the class of individuals most worthy of receiving the death penalty and to furnish guidance to the jury in determining whether to impose a sentence of death in a capital murder case. The class has been narrowed sufficiently in Blue's case.

*Id.* (emphasis added).

¶51. However, "the trial court in a sentencing proceeding should not submit as separate aggravators both the fact that the capital murder was committed during the commission of a robbery and that it was committed for pecuniary gain. The Court reasoned that where two aggravators essentially *comprise one circumstance*, it is improper for the jury to double weigh that circumstance." *Willie v. State*, 585 So.2d 660 (Miss. 1991). This rule has been reaffirmed by *Davis v. State*, 660 So.2d 1228 (Miss. 1995).

¶52. The crimes of kidnapping and robbery in this case were separate and distinct acts constituting two separate circumstances. They were properly before the jury to assist in determining whether to impose a sentence of death. Therefore, we find that sentencing instruction S-5 was properly given.

## VI. WHETHER THE COURT ERRED IN REFUSING INSTRUCTION D-19.

¶53. Goodin contends that the trial court erred in refusing Instruction D-19, claiming he was entitled to an

instruction on the lesser-included offense of manslaughter. He bases this claim on an assertion that the precise circumstances of the victim's death were unknown as there were no eyewitnesses to the shooting. Instruction D-19 reads:

> The Court instructs the jury that the killing of a human being without malice, by the act, procurement, or culpable negligence of another, shall be manslaughter. In the event that you do not find the Defendant guilty of Capital Murder as charged, nor murder, but do believe from the evidence beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that the Defendant is guilty of manslaughter, then it is your sworn duty to find the Defendant guilty of manslaughter.

After hearing argument from the attorneys, the trial judge denied Instruction D-19, finding that no evidence of manslaughter existed.

¶54. Jury instructions will always be considered as a whole as opposed to the singling out of any instruction. *Nicholson ex rel. Gollott v. State*, 672 So.2d 744, 752 (Miss. 1996). We have held that a manslaughter instruction should not be automatically or indiscriminately given, but only when warranted by the evidence. *Underwood v. State*, 708 So.2d 18, 36-37 (Miss. 1998). We have stated:

> Lesser-included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense. . . .

> A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drown in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).

*Welch v. State*, 566 So.2d 680, 684 (Miss. 1990) (internal citations omitted) (quoting *McGowan v. State*, 541 So.2d 1027, 1028 (Miss. 1989)).

¶55. Goodin cites *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) in which the United States Supreme Court held that the death sentence may not be constitutionally imposed after a jury verdict of guilty of a capital offense where the jury was not permitted to consider a verdict of guilt of a lesser included offense. *Beck* does not stand alone. In *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998), the Court explained its ruling in *Beck*, holding:

> The Court of Appeals justified its holding principally on the ground that respondent had been placed in the same position as the defendant in *Beck* - - that there had been a distortion of the fact finding process because his jury had been 'forced into an all-or-nothing choice between capital murder and innocence.' In so doing, the Court of Appeals again overlooked significant distinctions between this case and *Beck*. In *Beck*, the death penalty was automatically tied to conviction, and Beck's jury was told that if it convicted the defendant of the charged offense, it was required to impose the death penalty. This threatened to make the issue at trial whether the defendant should be executed or not, rather than 'whether the State ha[d] proved each and every element of the capital crime beyond a reasonable doubt.' In addition, the distortion of the trial process carried over directly to sentencing,

because an Alabama jury unwilling to acquit had no choice but to impose the death penalty. There was thus a significant possibility that the death penalty would be imposed upon defendants whose conduct did not merit it, simply because their juries might be convinced that they had committed some serious crime and should not escape punishment entirely.

These factors are not present here. Respondent's jury did not have the burden of imposing a sentence. Indeed, with respect to respondent's insanity defense, it was specifically instructed that it had "no right to take into consideration what punishment or disposition he may or may not receive in the event of his conviction or . . . acquittal by reason of insanity." In addition, the three-judge panel that imposed the death penalty did not have to consider the dilemma faced by Beck's jury; the alternative to death was not setting respondent free, but rather sentencing him to life imprisonment.

524 U.S. at 98-99, 118 S.Ct. at 1901-02 (internal citations omitted).

¶56. The Goodin jury did not face the dilemma of the *Beck* jury. Here, the jury's alternatives in the guilt phase were to convict Goodin of capital murder; simple murder; or to acquit him. Further, the jury's alternatives in the sentencing phase were to sentence Goodin to the death penalty; life imprisonment without parole; or life imprisonment. These options go far beyond sentencing the defendant to death or setting him free as condemned in *Beck*.

¶57. Having found no constitutional flaws in the jury instruction given, we must now determine whether our practice entitles Goodin to a manslaughter instruction. We have held that there must be some evidentiary support to grant an instruction for manslaughter. In the case sub judice, Goodin has shown none. In *Burns v. State*, 729 So.2d 203 (Miss. 1998), we stated:

'This homicide having occurred during the course of a robbery, it was capital murder, regardless of the intent of Griffin.' *Id.* In the case sub judice, Burns was engaged in the commission of robbery when McBride was killed. Thus, no manslaughter instruction was required to be given.

The record reveals that Burns never offered any mitigating evidence that would justify manslaughter rather than murder. There was nothing to indicate that this murder was done in the heat of passion. Because the burden to overcome the presumption of murder lies with the defendant, *Nicolaou v. State*, 534 So.2d 168, 171-72 (Miss. 1988), and because Burns failed to meet this burden, this issue is without merit.

729 So.2d at 225 (quoting *Griffin v. State*, 557 So.2d 542, 549 (Miss. 1990)).

¶58. The evidence in this case supports the trial court's denial of a manslaughter instruction. Goodin testified at trial in his own defense. He testified that he did not rob, kidnap or kill Willis Rigdon; yet he offers no alternative evidentiary scenario to show how the killing was culpable negligence manslaughter. Goodin testified that he went to Rigdon's Store to buy an x-rated video, but that Rigdon did not have any. He stated that he stayed at the store for around an hour and then left at exactly 2:57 a.m. He claims that when he left the store on foot, Rigdon was alive and well. Testimony from several other witnesses show that at 2:57 a.m. Rigdon had been taken to the hospital and pronounced dead. Further, Goodin testified that he was never in Rigdon's truck that morning and that he never saw or spoke to any of the witnesses who testified as to Goodin's whereabouts on the morning after the murder. Goodin contends that all the State's witnesses and the police formed a conspiracy against him in order to frame him for the murder of Willis Rigdon. Critically,

Goodin never offered any evidence to justify the giving of a manslaughter instruction. There was no evidentiary basis in the record to permit a jury to rationally find Goodin guilty of manslaughter. The trial judge correctly found that Goodin presented no evidence at trial to warrant an instruction on culpable negligence manslaughter. This assignment of error is without merit.

## VII. WHETHER THE COURT ERRED IN REFUSING SENTENCING INSTRUCTION D-10A

¶59. At sentencing Goodin proposed the following jury instruction:

> The Court instructs the jury that you need not find any mitigating circumstances in order to return a sentence of life imprisonment without eligibility for parole. A life sentence without eligibility for parole may be returned regardless of the evidence.

Goodin contends that the denial of this instruction was error. He argues that the denial of this instruction had the effect of a mandatory death sentence upon the jury's finding that no mitigating factors were proven in violation of his Eighth Amendment rights. The State contends that this instruction is a "mercy instruction" and was therefore properly denied.

¶60. In the sentencing phase, counsel should be allowed to argue for or against the death penalty. Such arguments necessarily include deterrence by the prosecution and mercy by the defendant. However, such arguments need not be accompanied by jury instructions. As we have long held, jury instructions are within the sound discretion of the trial court.

¶61. This Court has repeatedly held that "capital defendants are not entitled to a mercy instruction." *Jordan v. State*, 728 So.2d 1088, 1099 (Miss. 1998) (citing *Underwood v. State*, 708 So.2d 18, 37 (Miss.1998); *Hansen v. State*, 592 So.2d 114, 150 (Miss.1991); *Williams v. State*, 544 So.2d 782, 788 (Miss.1987); *Lester v. State*, 692 So.2d 755, 798 (Miss.1997); *Jackson v. State*, 684 So.2d 1213, 1239 (Miss.1996); *Carr v. State*, 655 So.2d 824, 850 (Miss.1995); *Foster v. State*, 639 So.2d 1263, 1299-1301 (Miss.1994); *Jenkins v. State*, 607 So.2d 1171, 1181 (Miss.1992); *Nixon v. State*, 533 So.2d 1078, 1100 (Miss.1987)). "The United States Supreme Court has held that giving a jury instruction allowing consideration of sympathy or mercy could induce a jury to base its sentencing decision upon emotion, whim, and caprice instead of upon the evidence presented at trial." *Id.* (citing *Saffle v. Parks*, 494 U.S. 484, 492-95, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)). However, arguments to the jury are not the same as jury instructions. Miss. Code Ann § 99-19-101(1) states in pertinent part: "The state and the defendant and/or his counsel shall be permitted to present arguments for or against the sentence of death." Thus, it is appropriate for the defense to ask for mercy or sympathy in the sentencing phase. It is likewise appropriate for the State to argue to "send a message" in the sentencing phase. Again, neither side is entitled to a jury instruction regarding mercy or deterrence. In light of the foregoing authority, we find the trial court's refusal to grant the mercy instruction was within his discretion and does not amount to reversible error.

## VIII. IS THE IMPOSITION OF THE DEATH PENALTY EXCESSIVE OR DISPROPORTIONATE IN THIS CASE?

¶62. Miss. Code Ann. § 99-19-105(3) (2000) requires this Court to perform a proportionality review when affirming a death sentence in a capital case. Section 99-19-105(3) states:

(3) With regard to the sentence, the court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; (b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; (c) Whether the sentence of death is excessive or dispropor tionate to the penalty imposed in similar cases, considering both the crime and the defendant; and (d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶63. After reviewing the record in this appeal as well as the death penalty cases listed in the appendix, we conclude that Goodin's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We also find that the evidence is more than sufficient to support the jury's finding of statutory aggravating circumstances. Further, upon comparison to other factually similar cases where the death sentence was imposed, the sentence of death is neither excessive or disproportionate in this case. Finally, we find that the jury did not consider any invalid aggravating circumstances. Therefore, this Court affirms the death sentence imposed in this case.

## CONCLUSION

¶64. Finding no reversible error, this Court affirms the judgment of the Lamar County Circuit Court.

¶65. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF LIFE IMPRISONMENT IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE BENEFIT OF PAROLE, SUSPENSION OR REDUCTION OF SENTENCE, HE BEING SENTENCED AS PER § 99-19-83 OF THE MISSISSIPPI CODE OF 1972, ANNOTATED, AS A HABITUAL OFFENDER, AND ONE PRIOR CONVICTION BEING A CRIME OF VIOLENCE, AFFIRMED.**

> **PITTMAN, C.J., WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. BANKS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**

> **BANKS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶66. While I agree with the majority that Goodin's conviction should be affirmed, I am compelled to dissent from its decision to affirm the sentence of death in the face of serious prosecutorial misconduct during closing argument.

¶67. The majority rightly recognizes and condemns the improper argument made by the prosecutor during the penalty phase denigrating the constitutional rights of persons charged with a crime in our country. It concludes, nevertheless, that the error was harmless because the evidence convinces it of Goodin's "callous indifference to human life." It is the jury, however, which must determine whether death is the proper

penalty, not this Court. The jury should make that determination without being exposed to the type of argument seen here. The death penalty requires a unanimous verdict of twelve jurors who agree that, taking all factors into consideration, the person on trial should be put to death. *See* Miss. Code Ann. §§ 99-19-101 & -103 (2000). To the extent that the condemned argument potentially affected a single juror in the decision to approve the death penalty, it was not harmless. *See **State v. Bey***, 645 A.2d 685, 725-26 (N.J. 1994) (Handler, J., dissenting) (finding that harmless error standard fails to account for complex value judgments made by jury in penalty phase; "harmless-error rulings cannot properly account for the effect those errors might have on the subsequent determination of the defendant's sentence's proportionality.").

¶68. Because I believe that the improper argument here had the potential to affect at least one juror, I would reverse the sentence and remand for a new sentencing hearing.

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999).

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999).

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*****Shell v. State***, 554 So. 2d 887 (Miss. 1989), ***Shell v. Mississippi,*** 498 U.S. 1 (1990) reversing, in

part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987)*, Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

\* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

## DEATH CASES REVERSED AS TO GUILT PHASE

## <u>AND SENTENCE PHASE</u>

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State*, 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

## DEATH CASES REVERSED AS TO GUILT PHASE

## AND SENTENCE PHASE

### (continued)

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

## DEATH CASES REVERSED AS TO

## PUNISHMENT AND REMANDED FOR A NEW TRIAL

## <u>ON SENTENCING PHASE ONLY</u>

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

***Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

***Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

***Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

### DEATH CASES REVERSED AS TO

### PUNISHMENT AND REMANDED FOR A NEW TRIAL

### ON SENTENCING PHASE ONLY

#### (continued)

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996). *Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.